ORIGINAL

AO 91
Rev. 11/97

## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

UNITED STATES OF AMERICA
v.

EVELYN PELAYO and
RUDOLFO EDROLE DEMAFELIZ, JR.

DOCKET NO.

MAGISTRATE'S CASE 08-0816M

FILED
CLERK, U.S. DISTRICT COURT

APR - 2 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

Complaint for violation of Title 8, Section 1324 (a) (1) (A) (iii), (Alien Harboring).

| NAME OF MAGISTRATE JUDGE | UNITED STATES MAGISTRATE JUDGE | LOCATION Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE JUNE 2005 - MARCH 2008 | PLACE OF OFFENSE LOS ANGELES County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about June 2005 to March 2008, in Los Angeles County, within the Central District of California, defendants Evelyn Pelayo and Rudolfo Ebrole Demafeliz, Jr., knowing and in reckless disregard of the fact that aliens and others had come to, entered, and remained in the United States in violation of law, knowingly concealed, harbored, and shielded those aliens from detection by immigration authorities within the United States, in furtherance of such violation of law.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
    (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge.

SIGNATURE OF COMPLAINANT
*Tricia Whitehill*

OFFICIAL TITLE
SPECIAL AGENT TRICIA WHITEHILL, FBI

Sworn to before me and subscribed in my presence,

SIGNATURE OF MAGISTRATE JUDGE(1)
*Carla M. Woehrle*

| DATE April 2, 2008 |

1) See Federal Rules of Criminal Procedure rules 3 and 54.
[Initials CHM:chm]            REC:

<u>Affidavit of Tricia Whitehill</u>

I, Tricia Whitehill, being duly sworn, do hereby depose and say:

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI").  I have been employed as a SA with the FBI since November of 2005.  Currently, I am assigned to the Los Angeles Field Office, Civil Rights Squad.  In that capacity, I am responsible for investigating the human trafficking of people into the United States.  The statements set forth in this affidavit are based upon my experience, training, consultation with experienced investigators and agents and other reliable sources of information relevant to this investigation.

2.   This affidavit is made in support of a criminal complaint and arrest warrant for EVELYN PELAYO ("PELAYO") and RUDOLFO EBROLE DEMAFELIZ JR a/k/a DUDEN ("DEMAFELIZ") for violation of Title 8, United States Code, Section 1324 (a) (1) (A) (iii), (Alien Harboring): knowingly and intentionally concealing, harboring and shielding illegal aliens in the United States.

3.   This affidavit is also made in support of search warrants for the following locations (collectively referred to as the "SUBJECT LOCATIONS"):

a.   5571 EAST VERNON STREET, LONG BEACH, CALIFORNIA ("PELAYO RESIDENCE"), for evidence of violations of

1

Title 8, Section 1324 (a) (1) (A) (iii), (Alien

Harboring) and Title 18.

b.  5561 EAST VERNON STREET, LONG BEACH, CALIFORNIA

("VERNON HOUSE"), for evidence of violations Title

8, Section 1324 (a) (1) (A) (iii).

c.  5651 EAST WALTON STREET, LONG BEACH, CALIFORNIA

("WALTON HOUSE"), for evidence of violations Title

8, Section 1324 (a) (1) (A) (iii).

4.   The facts and information set forth in this

affidavit are based upon a joint investigation conducted by

the FBI and Immigration and Customs Enforcement (ICE).  I know

the information contained in this affidavit through my

personal observations, records checks, information received

from other law enforcement personnel, informants, and

surveillance.  Furthermore, the statements in this affidavit

are based upon my training and experience as an FBI agent with

that of other FBI agents and law enforcement with whom I have

discussed this matter.

5.   This affidavit is intended to show that there is

sufficient probable cause for the arrest of PELAYO and

DEMAFELIZ and the search of the SUBJECT LOCATIONS and does not

purport to set forth all of my knowledge of our investigation

into this matter.

6.   The premises to be searched are described as

2

follows:

a.   The subject premises located at 5571 EAST VERNON STREET, LONG BEACH, CALIFORNIA ("PELAYO RESIDENCE"), is a two-story single family home.  The residence sits on the north side of East Vernon Street between Marber Avenue and Chatwin Avenue.  The residence is clearly marked with the number "5571" in black numbers on a white background located on the front of the residence, between the front entrance door and garage door.  The building is light tan colored stucco, with white trim and light tan wood siding on the second story above the white two-car garage door.  The white two-car garage door is located on the front (southwest) side of the residence facing East Vernon Street.  Above the front entrance is a maroon canvas awning.  The front entrance is two doors wide and dark wood colored.  There is a four-foot grey iron gate and a four-foot grey iron fence that extends across the front of the residence from the east side of the garage to the southeast corner of the residence.  The PELAYO RESIDENCE is the residence of the SUBJECT, EVEYLYN PELAYO, and her husband, Darwin Padolina, their two adult children, and their one minor child.

3

b.   The subject premises located at 5561 EAST VERNON STREET, LONG BEACH, CALIFORNIA ("VERNON HOUSE") is a single-family, one-story home.  The home is located on the north side of East Vernon Street, between the corner of Marber Avenue and Chatwin Avenue, directly west and next-door to the PELAYO RESIDENCE.  The building is peach-colored stucco, with a brown shingle roof, and a white two-car garage door located on the front (southwest) side of the residence facing East Vernon Street.  The VERNON HOUSE is an elderly care home that is owned by the EVELYN PELAYO and her husband, Darwin Padolina.

c.   The subject premises located at 5651 EAST WALTON STREET, LONG BEACH, CALIFORNIA ("WALTON HOUSE") is a single-family, one-story home.  The home is located on the southwest corner of East Walton Street and Radnor Avenue.  The residence is clearly marked with white numbers on a black background located on the southwest corner of the residence, to the right (east) of the front entrance.  The building is light tan colored stucco with white trim and an orange/brown shingle roof.  The front entrance is covered by a white metal security door and is located on the southwest corner of the residence,

facing west.  Red brick surrounds the front entrance door and a red-brick chimney is located on the west side of the residence.  There is a four-foot, white metal fence with concrete block pillars, surrounding the residence.  The WALTON HOUSE is an elderly care home that is owned by the SUBJECT, EVELYN PELAYO, and her husband, Darwin Padolina.

## ITEMS TO BE SEIZED

7.  The items to be seized from the SUBJECT LOCATIONS are follows:

a.  Documents pertaining to the time period of on or about July 2005 through the present, that relate to smuggling fees owed or paid by or on behalf of illegal aliens.  "Documents" in this context includes, original books of entry, general journal ledgers, cash receipts, credit card receipts, cash receipt notes.

b.  Identification documents and copies of identification documents including drivers' licenses, social security cards, passports, resident alien cards, employment authorization cards, and foreign identification cards, pertaining to CS2 or CS3.

c.  Travel receipts, tickets, and vouchers, pertaining

5

to the time period of on or about July 2005 through
the present.

d.   Letters, postcards, audiocassette tapes, and other
correspondence containing communications by or to
the subjects and/or smuggled aliens, pertaining to
the time period of on or about July 2005 through the
present.

e.   Documents pertaining to the time period of on or
about July 2005 through the present, relating to any
contracts or employment records concerning illegal
aliens who were smuggled into the United States and
harbored by defendants or their associates.

f.   Women's jewelry.  Personal items and effects, travel
bags, duffel bags, suitcases, and other items used
to carry personal property such as clothes,
belonging to smuggled aliens.

g.   Bank statements, checks, deposit tickets, check
registers, credit card receipts, invoices, money
orders, travelers checks, and cashier checks,
pertaining to the time period of on or about July
2005 continuing through the present, that show
receipt or distribution of profits from smuggling,
and harboring activities.

h.   Documents, statements, and keys relating to any bank

6

safe deposit box or storage unit, pertaining to the time period of on or about July 2005 continuing through the present.

i. Address books, telephone notes, appointment books and calendars, pertaining to the time period of on or about July 2005 continuing through the present.

j. Lists of aliens smuggled into the United States.

k. Travel documents, including those in the form of passports or identity documents, pertaining to the time period of on or about July 2005 continuing through the present.

l. Money grams, checks, money transfer records, money orders, or other forms of payment relating to harboring, smuggling and the elder-care business operations, pertaining to the time period of on or about July 2005 continuing through the present.

m. Any documentation tending to prove who owns or is in control of the SUBJECT LOCATIONS, such as mail, phone bills, and other utility bills and receipts, loan documents, records of ownership, leases and bill paying records, pertaining to the time period of on or about July 2005 continuing through the present.

n. United States currency in any amount over $500.

7

o. Any photographs, videotapes and/or audiotapes depicting smuggled aliens, pertaining to the time period of on or about July 2005 continuing through the present.

p. Payment records, ledgers and tally sheets reflecting harboring and/or smuggling activities, pertaining to the time period of on or about July 2005 continuing through the present.

q. Cellular and other mobile telephones, personal data assistants, and electronic pager devices, pertaining to the time period of on or about July 2005 continuing through the present.

r. All photographs, videotapes, or other visual media and CDs, pertaining to the time period of on or about July 2005 continuing through the present, that relate to fruits, instrumentalities and evidence of violations of federal laws, specifically evidence, fruits, and instrumentalities of the violations Title 8, Section 1324 (a) (1) (A) (iii), (Alien Harboring).

## BACKGROUND ON HUMAN TRAFFICKING

8. Based on my training and experience as a Special Agent with the FBI, I am aware that human trafficking operations typically operate as follows:

8

a.  Victims are smuggled into the United States for purposes of involuntary servitude.  These victims are smuggled by "traffickers" who reside in and outside the United States. For the purposes of this affidavit, the term "trafficker" includes, but is not limited to, alien smugglers, human traffickers and any of their agents, brokers, employees and/or agents.

b.  These victims are initially lured into the United States by false promises of favorable job conditions and relatively high wages.  The victims do not have the money required to travel into the United States so they agree to be smuggled into the United States for a fee.  The traffickers use a network of co-conspirators to arrange for the international transport of these victims.

c.  After the victims arrive in the United States the traffickers instruct them to work extremely long hours with very few breaks or days off, so that the victims can quickly repay the smuggling debt.  The traffickers will often house the victims at their residences in order to keep a close watch over them.

d.  Traffickers also often create a climate of fear in order to coerce their victims to continue to work

9

and to help the traffickers avoid detection from law enforcement. Tactics to that end include instilling fear of law enforcement and especially immigration authorities, isolating victims from sources of aid by insisting that outsiders will report illegal aliens to law enforcement, and engendering mutual mistrust among the victims. These threats are typically unrelated to a good faith effort to report illegal activities, as evidenced by the fact that the traffickers' only report or threaten to report their victims if they refuse to work.

e.   Traffickers also usually maintain records of trafficking debts that are often recorded in books, notes, ledgers, pay/owe sheets, and IOUs. They also typically maintain large sums of cash, bank account records and records of money wires (international and domestic). Often such documentary evidence is written in coded manner to hide the illegal activity, and the traffickers often maintain these records in the form of hand-written notes. The funds often are or contain the proceeds of the trafficking activity including, but not limited to, debt payments. Traffickers often keep these records for an extended period of time, and these records

document business profits and expenses. Traffickers are also known to maintain travel itineraries that relate to illegal activities including records of trips taken to recruit and obtain victims and to transport funds and documents to various locations.

f.   It is routine for traffickers to hide the proceeds of their illegal activity in secure locations within their homes, apartments, businesses, storage facilities, safe deposit boxes and vehicles. The documents mentioned in the aforementioned paragraph are commonly maintained in these locations. These records are routinely maintained for extended periods. This is especially true when employment relationships related to illegal trafficking activities extend over a long period of time.

g.   Traffickers routinely maintain assets associated with their criminal activity such as vehicles, mobile telephones, bank accounts and real estate holdings under fictitious names or under the names of other persons (nominee subscribers) such as relatives and/or associates to avoid detection by law enforcement. Despite the use of fictitious names, traffickers maintain control over these hidden assets. Additionally, traffickers often make

travel arrangements under fictitious names or under the names of other persons, as described above, to avoid detection by law enforcement.

h.   Traffickers maintain address and/or telephone books listing names and/or clients of those involved in their criminal activity. Often these names, addresses or telephone numbers will be in code.

i.   Traffickers, like many people, frequently take, or cause to be taken, photographs of their residences, their property, and their victims that they smuggle. Traffickers maintain these photographs in their homes, businesses, storage lockers, safety deposit boxes and automobiles. These photographs will often show traffickers and the trafficked victims together.

j.   Traffickers are known to use mobile telephones and personal data assistants to communicate with their customers as well as co-conspirators. These communication devices have memory storage capabilities, including the storage of return telephone numbers and addresses which often belong to co-conspirators involved in the human trafficking, harboring, importation, and transportation of aliens.

12

k.   As a matter of routine, traffickers maintain documents and/or indicia, which is evidence of their occupancy or ownership of their residential and/or business premises.  The documents and indicia are commonly found on their person and in their residence.  Such documents include, but are not limited to nominee banking records, foreign bank records, utility bills, rent receipts, pager/mobile telephone receipts, rental/lease agreements, payment receipts, personal mail and other correspondence addressed to persons at the residence.

l.   Traffickers often maintain custody of documents belonging to the victims, including identification documents, passports and other travel-related documentation to prevent the victims from leaving on their own initiative.  These documents are typically held in homes, businesses and/or safety deposit boxes.

m.   The trafficking victims often maintain personal letters and handwritten notes at the locations where they live and work, which are indicia of where they reside and what activities they are engaged in and with whom.  For example, some trafficking victims maintain their own records of debt payments, so that

13

they can reconcile them with their trafficker's records.

n. Traffickers often maintain items associated with their business off-site so the items will not be discovered during a raid by law enforcement or inspection by regulatory officials. Such items include, but are not limited to, pay/owe sheets, laundry receipts, toiletries, tally sheets, handwritten documents, such as receipts, bills and cancelled checks paid to other persons.

## FACTS ESTABLISHING PROBABLE CAUSE

9. On September 13, 2007, a Confidential Source (CS1), a neighbor who lives near the VERNON HOUSE and the PELAYO RESIDENCE, reported to FBI SA Tricia Whitehill that PELAYO runs an elder care facility at the VERNON HOUSE and that the Filipino workers who live and work at the VERNON HOUSE are kept in the house. CS1 provided the following additional information:

a. PELAYO owns two private residences in Long Beach, California that are used as elder care facilities.

b. Four Filipino people seem to work nearly 24 hours per day, seven days per week, caring for approximately five or six elders at VERNON HOUSE.

c. Filipino workers also work for PELAYO at a separate

property located at 5651 Walton Street (the WALTON HOUSE).

d. CS1 used to see one of the workers CS2 in the yard at the VERNON HOUSE. CS1 used to see CS2 walking the elders in front of the house. Onetime CS2 asked CS1 for his help.

e. CS2 told CS1 that she owes PELAYO a smuggling debt and that she can not leave the VERNON HOUSE because she is afraid that the police will find her and deport her.

f. CS1 had not recently seen the Filipino workers in the yard and stated that it seemed to him that they were no longer allowed to leave the house.

10. On October 6, 2007, FBI SA Tricia Whitehill and ICE SA Miguel Palomino interviewed a Confidential Source ("CS2"). CS2 was interviewed again on October 26, 2007 by SA Whitehill, on November 20, 2007, by SA Whitehill and SA Megan R. Tuggle of the FBI. CS2 was also interviewed on January 5, 2008 by SA Whitehill and SA Palomino, and again on February 2, 2008 by SA Whitehill and ICE SAs Palomino and Oliver Ramelb. CS2 told agents the following:

a. CS2, a Philippines national, was living in a small province in the Philippines when she was contacted by PELAYO regarding work in the United States on or

15

about July 2005.   CS2 accepted PELAYO's offer of
employment providing nursing care services for
elderly clients in a nursing home owned by PELAYO in
the United States.

b.   PELAYO had multiple telephone conversations with CS2
whereby PELAYO instructed CS2 regarding the
arrangements to have CS2 smuggled into the United
States.

c.   PELAYO told CS2 to contact a man named RUDOLFO
EBROLE DEMAFELIZ JR a/k/a DUDEN ("DEMAFELIZ").
DEMAFELIZ is a Philippines citizen and a Taekwondo
instructor living in Manila.   PELAYO instructed that
DEMAFELIZ would train CS2 in Taekwondo and that CS2
would obtain a visa to travel to the U.S. to
participate in a Taekwondo tournament.

d.   PELAYO did not indicate how much money it would cost
for the smuggling fee nor did PELAYO state how much
CS2 would be paid to work at PELAYO's facility.

e.   CS2 contacted DEMAFELIZ.   DEMAFELIZ instructed CS2
to fly to Manila where she would live with and train
under DEMAFELIZ as a Taekwondo student.

f.   During the months of August and September 2005, CS2
lived in an apartment rented by DEMAFELIZ and
trained everyday in Taekwondo.   DEMAFELIZ paid all

CS2's expenses.

g.  DEMAFELIZ took CS2 to the embassy in Manila to obtain a tourist visa.  DEMAFELIZ provided CS2 with a written questionnaire which provided all the likely questions CS2 would be asked by embassy officials.  The questionnaire also provided corresponding answers that CS2 should provide.

h.  Fifteen people, including CS2, went with DEMAFELIZ to the embassy to obtain tourist visas.  Five of the fifteen applicants obtained tourist visas to enter the United States by falsely stating that the purpose of their travel was to  participate in a Taekwando tournament.

i.  CS2 was granted a tourist visa and flew with DEMAFELIZ and others in October of 2005.

j.  When CS2 arrived in Los Angeles, California, DEMAFELIZ took her passport and told CS2 he would hold it for safekeeping.

k.  DEMAFELIZ and CS2 stayed with DEMAFELIZ's sister in Glendale, California for approximately one week.

l.  In response to CS2's comment that she was eager to get to work, DEMAFELIZ told CS2 that she should not be in such a rush because she was going to be a "prisoner" once she began working for PELAYO.

m.   After one week in the U.S., DEMAFELIZ delivered CS2 to PELAYO in Carson, California.   DEMAFELIZ and PELAYO spoke in private for approximately thirty minutes before PELAYO drove CS2 in her car to Long Beach, California.

o.   En route from Carson to Long Beach, PELAYO gave CS2 strict instructions regarding the terms of her work and living situation.   PELAYO told CS2 that she could not trust anyone.   She elaborated that CS2 should not speak to the family members of the elders and to avoid any personal conversations with her co-workers.

p.   PELAYO also told CS2 that for 10 years CS2 could never go to work for anyone else.

q.   PELAYO told CS2 that she would earn $600/month, but that she would have to repay PELAYO $12,000 (USD) for her smuggling debt. As a result, PELAYO would hold back $200 of her $600 salary.

r.   Immediately upon CS2's arrival, PELAYO also warned CS2 that there would be severe consequences if she ever tried to stop working for her by running away.

s.   PELAYO threatened CS2 that she would falsely accuse CS2 of stealing property from PELAYO if CS2 ever tried to run away. PELAYO emphasized that the police

18

would put CS2 in jail if this happened.   PELAYO
repeated this threat to CS2 many times during the
period that CS2 worked for PELAYO.

t.   PELAYO also threatened CS2 that she would call the
police to report CS2 as an illegal worker if CS2
tried to run away. PELAYO warned CS2 that if that
happened, the police would call immigration
authorities who would in turn track down CS2, put
CS2 in jail for a long time, and then deport her.

u.   PELAYO warned CS2 that she would deny ever knowing
her if the police caught CS2 and figured out that
she was illegally residing and working in the
country.

v.   PELAYO warned CS2 that any attempts to report PELAYO
to authorities would be futile because the police
would believe PELAYO and not CS2, because PELAYO is
a United States citizen and CS2 is not.

w.   CS2 stated that she believed these threats and was
afraid of PELAYO.

x.   CS2 reported that PELAYO keeps employee files and
records for all of her workers. PELAYO told CS2 that
she keeps specific track of the balances on debts
owed by the workers in a book.  CS2 reported that
PELAYO keeps the passports of the Filipino workers,

19

along with all other papers relating to her business in the master bedroom of the PELAYO RESIDENCE.

y.  CS2 reported information related to his/her working conditions for the two years that CS2 worked for PELAYO. CS2 stated that she worked nearly 24 hours per day and usually only took off two days per month.  CS2 did not have any days off between April and July of 2007.  Her daily chores included preparing meals, bathing and caring for the elders.

z.  CS2 stated that she generally felt like a prisoner. CS2 stated that she had very little freedom of movement.  CS2 stated that she earned very little money especially after PELAYO deducted a payment for her smuggling debt.  PELAYO also regularly expressed hostility towards CS2, complaining that CS2 was not working hard enough.  PELAYO would also verbally abuse CS2, calling her a "mother fucker" and a "stupid shit."

aa. CS2 reported that PELAYO withheld CS2's passport documents.  On several occasions CS2 asked PELAYO for CS2's passport back but PELAYO refused. On February 28, 2008, PELAYO told CS2 that she had sent CS2's passport to DEMAFELIZ in the Philippines.  CS2 believes that PELAYO was lying about sending his/her

20

passport to DEMAFELIZ because one of CS2's co-workers told CS2 that she had seen the passport in a drawer inside PELAYO's bedroom closet.

bb.   CS2 provided information about PELAYO'S deliberate and knowing fraudulent activities in connection with the elder care business.

cc.   PELAYO instructed CS2 and the other staff members at her elder care facilities to lie to investigators and other DSS representatives who regularly visited the facilities. Specificlaly, PELAYO told CS2 to falsely tell officials that CS2 only worked eight hours a day and that workers were not allowed to live and sleep in the same home as the elders.

dd.   CS2 and the other workers followed these instructions to lie to DSS regarding the number of hours they worked everyday and they also falsely told DSS investigators that they did not sleep at the facilities, when in fact they did.

11.   On February 2, 2008, while still working for PELAYO, CS2 was provided a recording device and a transmitter by FBI SA Tricia Whitehill and ICE SAs Miguel Palomino and Oliver Ramelb.  CS2 approached PELAYO in order to discuss the amount of his/her smuggling debt, the payments made to date by CS2 against that debt, and the whereabouts of CS2's passport.

During that conversation the following statements were made by PELAYO:

a.  CS2 owed PELAYO a $12,000 debt.

b.  CS2 would be finished paying the debt owed to PELAYO in one year and four months.

c.  PELAYO used her own money to bring CS2 into the United States.

d.  PELAYO did not charge CS2 interest on the $12,000 debt owed by CS2.

e.  PELAYO had CS2's passport.

f.  PELAYO sent CS2's passport to DEMAFELIZ in the Philippines.

g.  PELAYO told CS2 "You cannot leave me, After 10 years maybe you can go home.  I don't want you to stab me in the back."

h.  PELAYO told CS2 that after working for PELAYO for ten years he/she would have to return to the Philippines and that he/she could not work for anyone else in the U.S. other than PELAYO.

i.  PELAYO told CS2 that "In business you have to cheat. If you follow the rules here you will suffer.  You will never make money.  That's why you have to break all the rules regarding insurance, payroll... Everyone that works for me does not have their

papers."

12.   In May of 2007, another Filipino national named CS3 came to work at the VERNON HOUSE.  CS3 worked during the day as a construction worker at the VERNON HOUSE and provided care to elderly clients at the VERNON HOUSE at night.

13.   Like CS2, PELAYO recruited CS3 in the Philippines to work at one of her elder care facilities.  PELAYO and DEMAFELIZ arranged for CS3 to illegally enter the United States, using the ruse that CS3 was entering the United States to participate in a Taekwondo competition.

14.   On January 4, 2008, FBI SAs Tricia Whitehill, Michael Paysan, and ICE SA Miguel Palomino interviewed CS3.  CS3 told agents the following information:

    a.   CS3 came to the United States in May of 2007 and has worked for PELAYO ever since.  He/she works as an elder care giver at the VERNON HOUSE.  Prior to coming to the United States, CS3 worked as a construction worker in the Philippines.  CS3 had helped to build a home for PELAYO in the Philippines, which is how he/she came to know her.

    b.   In early 2007, PELAYO called CS3's uncle and asked him if he knew anyone that would be interested in coming to work for her in the United States.  PELAYO told CS3's uncle that the worker would make

$600/month, minus $300/month for the smuggling fee.

c. While still in the Philippines, CS3 spoke to PELAYO over the telephone. PELAYO told CS3 that CS3 would be working as an elder care giver. CS3 accepted PELAYO's employment offer. CS3 and PELAYO never spoke about what hours he/she would be working, however CS3 believed that he/she would have time to work at a second job while working for PELAYO in the U.S.

d. CS3 trained in Taekwondo by DEMAFELIZ and obtained a tourist visa.

e. In May 2007, CS3 traveled to the United States from the Philippines with DEMAFELIZ and five other Filipinos.

f. When CS3 arrived in the U.S., PELAYO took CS3's passport. PELAYO still possesses CS3's passport.

g. PELAYO told CS3 that he owes her a $12,000 smuggling debt.

h. PELAYO told CS3 that CS3 could not work for anyone else and that CS3 would have to work for PELAYO for at least 10 years.

i. While employed by PELAYO, CS3 worked nearly 24 hours each day. CS3 worked on a construction project for PELAYO at the VERNON HOUSE during the daytime and

24

provided elder care services at night.  He/she had to get up to care of the elderly clients several times each night. As a result, he/she did not sleep very much or at regular times. When he/she did sleep, he/she slept on a sofa in the kitchen of the VERNON HOUSE.

j. CS3 stated that he/she did not have freedom of movement.  CS3 required permission to run personal errands.  CS3 is afraid of PELAYO.

k. PELAYO warned CS3 that he should be afraid of the police. Specifically, she stated that CS3 would be in trouble if the police ever picked him/her up because he did not have papers legally permitting him to be in the country.  PELAYO told CS3 that immigration officials would be called and that CS3 would be taken to jail.  PELAYO also told CS3 not to be out when it was dark because the police would catch him/her and pick him/her up. PELAYO further warned CS3 that she would not help him/her if the police found him/her.

l. As she instructed CS2, PELAYO instructed CS3 to lie to DSS officials regarding the number of hours that CS3 worked everyday and not to tell DSS officials that he/she slept at the VERNON HOUSE.

m.   On February 19, 2008, CS3 escaped from PELAYO.

n.   Immediately after CS3 escaped, federal agents conducting surveillance at the VERNON HOUSE and SUBJECT PREMISES observed PELAYO and her husband, Darwin Padolina, exit the PELAYO RESIDENCE, enter separate vehicles and begin to search for CS3.

o.   PELAYO has recruited CS3's cousin in the Philippines to work for her in the U.S.  CS3's cousin has been training with DEMAFELIZ and has made multiple unsuccessful efforts to obtain her tourist visa.

15.   On the evening of February 19, 2008, the night of CS3's escape, CS2 was provided with a recording device and transmitter by SA Whitehill and ICE SA Ramelb, whereby the following admissions were made by PELAYO:

a.   PELAYO stated that she drove around looking for CS3 but could not find him/her anywhere.

b.   PELAYO told CS2 that she would call the police and have CS3 arrested.

c.   PELAYO told CS3 that she was going to call the police and tell them that CS2 stole something from her.

d.   PELAYO threatened CS2 that there was a record when CS2 and CS3 came to the U.S. and that PELAYO could easily put CS2 and CS3 in the "blotter" [slang for

26

reporting to the police].

e.   PELAYO told CS2 that she was going to call the
     police and have CS3 deported.

f.   PELAYO admitted that CS3 left without paying the
     debt CS3 owed to her.

16.   CS2 reported that after CS1 escaped, PELAYO took
jewelry and CS3's passport from the PELAYO RESIDENCE and gave
them to a worker that she apparently trusted in the VERNON
HOUSE for that worker to hide.   CS2 took pictures of the
jewelry and passport with her camera phone.

17.   After CS3 escaped, PELAYO told CS2 that she filed a
report with the police indicating that CS3 had stolen jewelry
from her before he/she escaped.   Subsequent investigation
confirmed that PELAYO did in fact file police report on
February 20, 2008, stating that CS3 had run away and that $700
and some jewelry was missing. The report notes that PELAYO
told the officers that CS3 had been living with her family,
and that she found the property missing the same day he/she
had run away. The report explicitly states that "Pelayo
believes that he [CS3] took her property." CS2 reports that
she observed PELAYO searching for a picture of CS3 to give to
the police when she filed the report.

18.   On February 22, 2008, CS3 was provided with a
recording device and placed a telephone call to PELAYO.   The

27

following admissions were made by PELAYO during that conversation:

a.  PELAYO stated that CS3 originally owed her $12,000 for a smuggling fee to enter the U.S. from the Philippines.  In the course of the conversation, PELAYO acknowledged that CS3 had paid $1800 to PELAYO and noted that he still owed her $10,200.

b.  PELAYO stated that she reported CS3 to the police after he escaped from her, and that her report included a claim that CS3 had stolen her property.

c.  PELAYO told CS3 that she reported to police that CS3 had stolen property from her, stating that "it is just like you stole from me, because...you ran away, you didn't say goodbye. You know that you have a debt, you ran away."

d.  PELAYO offered to withdraw her police report if CS3 paid her the debt that CS3 owed her.

19.  Further investigation of airline travel records shows that between the year 2000 and the present, DEMAFELIZ has made approximately twenty round trip journeys between the Philippines and the United States. Since 2005, twenty-four (24) Philippines nationals who entered the United States with DEMAFELIZ on those trips have never exited the United States, according to those airline records.

28

## CONCLUSION

Based on the facts contained in this affidavit and my experience and training, I believe there is probable cause to believe that EVELYN PELAYO and RUDOLFO EBROLE DEMAFELIZ JR a/k/a DUDEN have violated Title 8, United States Code, Section 1324 (a)(1)(A)(iii) and that the SUBJECT LOCATIONS contain evidence of those crimes.

TRICIA WHITEHILL
Special Agent, FBI


Sworn and subscribed to
before me this 2nd day
of April 2008

Hon. Carla M. Woehrle
United States Magistrate Judge

29